Alliance v. Bradford Good morning, Your Honors. May it please the Court, I am Pete Frost. I represent Pellons-Fantana Wilderness Alliance in this appeal. I would like to address the Wilderness Act claim first and then the NEPA claim and, of course, answer any questions you may have. On the Wilderness Act claim, the record in this case establishes these facts. These wilderness lands were once part of a large ranch in the Big Sur. The ranch was sold off in 1990 and subdivided. The lands at issue in this case were then owned by a retired couple for five years, and that couple sold the lands to the Trust for Public Lands. The Trust then worked with the Forest Service using federal land and water conservation monies to bring these lands into public ownership, and the Forest Service secured title to these lands in November of 1997. There was no livestock grazing at that time. Was there during the period of time that the retired couple owned it? There is a dispute of fact whether there was grazing during the period when the Zitterbarts owned the lands. And in the district court, we submitted a declaration from Ms. Zitterbart who said that she and her husband had never leased the lands to livestock permittee. The Forest Service submitted in rebuttal a declaration from an individual who said that he had leased the lands from Ms. Zitterbart's late husband. But anticipating the issue, Your Honor, I don't think that that dispute is one of material fact that would preclude summary judgment on the Wilderness Act claim for this reason. The record is clear that grazing ceased while these lands were in private ownership. Whether it was in 1990 or in April of 1995 doesn't seem to me to matter a great deal. Either way, they ceased when they were in private ownership, and they were not grazed for the two-and-a-half-year period when the Trust for Public Lands owned them. In fact, the first time that the agency received even a proposal to graze these lands was in 1999, two years after they had come into public ownership. So there had been no grazing to suspend when the agency obtained title, and there was no grazing threatened with being phased out when Congress chose to specially designate these lands as wilderness in 2002. As this Court is aware, Congress defined wilderness to include lands of primeval character where natural conditions are to prevail. And to achieve that objective, Congress broadly prohibited commercial enterprise in wilderness, but it also enacted the exception that's at issue in this case in certain circumstances for ongoing livestock operations. The exception, as we read it, is meant to preserve active grazing programs so that a permittee who is running cattle or sheep on federal lands that are designated as wilderness by Congress is given the surety that he or she may continue to operate her business on those lands while it is administered as wilderness. As the grazing guidelines that Congress specifically incorporated into the Act adding these lands to Silver Peak Wilderness State, it was Congress's intent to stop the practice of agencies previously using the designation of wilderness to phase out existing operations. It was about assuring that these folks had the certainty to which they were entitled to continue to run their operations. But factually, in this case, the law would not accept this kind of operation. There was no grazing at all when Congress designated these lands as wilderness. In fact, the lands had not even been designated as a livestock allotment under the relevant forest plan. There was no permittee. There was no ongoing operation. And Congress is presumed to know the facts on the ground when it makes the decisions that it does. The disconnect here between what the Forest Service did is that it had begun a NEPA process when it administered these lands as general public lands under its organic authorities, and yet it never changed its mind after 2002 to propose to continue grazing on these lands. That's the question that the Court may have about where do we draw the line in this case. I think there are situations where you can have grazing. For example, you can have a designated livestock allotment with a current permittee who, because of drought or fire or some other natural circumstance, takes what's called non-use and agrees with the agency. It actually has to contractually agree not to turn out livestock, but takes non-use and decides not to turn out livestock onto allotment. And if, in that circumstance, during that time period Congress were to decide to designate those lands as wilderness, I think fairly that is the kind of active grazing program, even though there aren't livestock on the ground. So you're saying the government has to recognize it in some fashion? I'm sorry, Your Honor? The government has to recognize a right to grazing before they could continue grazing after the wilderness designation? Yes. I think the guidelines anticipate there will be existing authorities is the word that Congress used in the guidelines. A designated allotment, an existing permit, active grazing operations, all of these things. Active grazing operations. How long was the grazing not going on here? What was the time Well, the plant's position is that it ceased in 1990. The Forest Service's position is that it ceased in April of 1995. But there is, on the record, there should be no dispute, given the agency's admissions in the district court, that there was no grazing on the TPL on the land. So it was from April of 1995 until 2002. Let's suppose that the land had, this is obviously a hypothetical, that the land had gone directly from Cozy Cove ownership to the government, and the government then took two years or so to decide whether to permit grazing on the property. Would that be different? I mean, had there been a genuine suspension of grazing, as the government asserts it is? During the government, the Forest Service takes possession of the land and then does an assessment, and the assessment takes two years, could they allow grazing that had occurred before? Would that materially change things? And the wilderness exhumation occurs the two years later. That's the court's question. Sometime during the time that the Forest Service took possession of the land. No, Your Honor. You know, applying the guidelines, I think the answer to that question is no. If the government takes possession of land that's now designated wilderness, and there's been a hundred years of grazing in back of it, if they take any amount of time to determine whether to allow continued grazing, the school's out. Yes, Your Honor, that's correct. Because I think what Congress meant to preserve was something very different than that's the scenario you're suggesting. Now, in this case, there were lands that were grazed when the Forest Service obtained title. And in fact, despite its representations that it has a policy of suspending such grazing, it did continue to allow grazing on an annual basis for one of the reserve ranch. But that's not an issue in this case. What's an issue in this case are these particular lands and the time frame with which no grazing occurred. Lastly, perhaps on this point, I want to emphasize we recognize that there are many ranchers in the West that rely on federal forage to sustain their operations, particularly where federal public lands abut private base ranches. That's not the situation here. This is a situation where calves are trucked in and trucked off for forage. And there is not a private base ranch here. There isn't that kind of linkage, I think, that the themes of Congress articulated in the guidelines are meant to do. Well, in this case, they're trucked in and trucked off because there's a season during which they're not allowed to graze at all, right? That's correct, Your Honor. It was they were run yearlong when they were in private ownership until 1990. And I, frankly, I don't know whether it was trucked in or trucked off at that time. Temporally, there was greater livestock grazing temporarily prior to the Forest Service's decision than there is now. If the Court has no further questions on the Wilderness Act claim, I'd like to turn to the NEPA claim, please. We have emphasized two deficiencies in the environmental assessment that the Forest Service prepared to authorize grazing on these lands. The first relates to recreation. As the Court is aware, when the Forest Service prepared an appraisal of these lands in the year 1994, it found that present use was open space with occasional recreational use. And when the Forest Service went through the public comment period to prepare its EA, ultimately in 2005, my clients raised the issue that authorizing grazing on those lands would conflict with the public's recreational use. The answer that the Forest Service gave to those concerns was, but there aren't any developed recreational facilities on these lands, i.e., there aren't developed and paved trails, perhaps, or kiosks or campgrounds or that sort of thing. But the answer, and the question of whether NEPA is taking a hard look at the environmental effects of authorizing grazing in this circumstance, is it's simply, it's precisely because these lands did not have developed structures and improvements that qualified them to be wilderness in the first place. So the agency never did reconcile its authorization of grazing with the conflict of recreation that was brought before it. In its briefs, it suggests that because it temporarily limited grazing to December 15th to April 15th season of use, that that's what it did to mitigate for such conflicts. But that season of use was chosen even before these lands were designated as wilderness, and they were chosen for forage for cattle. They weren't chosen to mitigate for conflicts. And finally on this point, you know, this is relatively dry country in the southern Big Sur. It's the kind of place where that is exactly the kind of time, March, April, May, when you want to be out on these lands, because they do have wildflowers, and they do have forage and grasses that make them pleasant places to be and experience as wilderness. So there's a real conflict here that wasn't resolved in the EA. In my remaining short time, there's a parallel problem with the EA as it relates to plants and plant communities. Congress did designate these lands as wilderness to preserve their natural conditions, and the real question is, is there a resolution in the record in this case of the conflicting information that exists about the presence or status of native plants and plant communities in these lands? Through the briefs, it's very clear that the Forest Service keeps on getting different kinds of information, sometimes from California Native Plant Society volunteers, sometimes from its own contractual biologists, but there's no squaring of all this information at the end and a resolution that says, I now understand completely what's going on, and I hereby make a decision to authorize grazing because I find it to be inappropriate. Instead, what the agency was attempting to do was look exclusively for plants either threatened or endangered under the Endangered Species Act or listed as sensitive in its own manual, which is really different than, excuse me, it's a subset of what Congress meant to achieve for wilderness. Congress didn't designate wilderness simply to restore those plants that were already on the brink of extinction and preserved in their natural conditions, and that would include in the context of plants the native vascular plants and plant communities that exist on these lands. If the Court has no further questions for me, thank you. Thank you. You have about a minute and a half for about a minute. May it please the Court, Michael Gray on behalf of the Forest Service. I think there are several problems with having the Wilderness Act termination turn on whether a federal permit existed at the time the area was established. The language of the statute doesn't say anything about that. It just says grazing of livestock where established. If Congress had meant to mean only where there's a federal permit, it could have easily said grazing of livestock where established pursuant to a federal permit. The second is that there's no reason to treat the same activity on the lands differently based on whether or not it's a federal permit or simply private grazing. In this case, for example, it would just turn on an accident of timing. Had the Forest Service, when it completed its first environmental assessment in 2001, simply issued a permit rather than withdrawing it on the basis of some comments and restarting the process again, then it would be established according to their theory. Does the record reflect how many animals per acre? There's 20 to 25 cows. The parcel itself is something like 350 acres, 185 of which are in the wilderness. They're there for December 15th to May 15th, I think. I don't think this is in the record, but it's a horse roundup ranch where they go out with horses. It's not a motorized vehicle operation. How many cows in those homes? 20 to 25. The third reason why it doesn't make any sense to have it turn on a federal permit is that it would provide a disincentive to the expansion of wilderness areas. You could have a private operation, a ranch that would like to continue its ranching operations but would like the area to be subject to the other protections of the Wilderness Act. If it turns on whether or not they previously had a federal permit, there would be a disincentive to selling the land to the federal government for that purpose. I don't think the delay here from the Trust for Public Lands process really makes any difference either because the Forest Service always had the intent here to acquire this land, but it didn't have the money. The Trust for Public Lands agreed to work with the Forest Service to acquire it while the Forest Service could obtain funding, so I don't think that any delay while the Trust for Public Lands owned the land makes any difference either. What if they had owned it for 10 years? I don't think the inquiry can turn solely on time. I think that there has to be some level of an intent, some evidence of an intent to abandon the previous grazing uses. I don't think 10 years may be enough. 50, then maybe there's some problem. The process was clear from the outset that this was going to be transferred to the Forest Service as soon as the funding was made available, that the delay doesn't make any difference. As I was saying, the Forest Service expressed its intent here pretty clearly to continue the grazing operations. It says in the EA that the ranchers have requested, since they've acquired it, that they be able to continue the grazing. The surrounding areas are management areas for grazing, so it should be no surprise that this was, in fact, considered for grazing from the beginning. They began analyzing it shortly after they acquired it in 1999, before it ever became a property. The Forest Service appraiser said that part of the highest and best use for this land is limited livestock grazing, which is what we have here. Is there a map in the record? I didn't dig into the record to see, but it would have been helpful if I could see a map that shows how this 185 acres got accidentally picked up in a wilderness area. I'm not sure whether there's a map in the record that shows that or not. You're talking about four or five forties in the middle of a whole bunch of other land. I think it's just the way that the land sort of abuts up against the wilderness, so I think it was just an extension of the wilderness down. This is not contiguous to a private ranch that just has an allotment for a certain number of pairs to go in and out during certain periods of time. What ranger district is this in? This is the Monterey district, I think. I'm not sure. Which forest is it? It's the Los Padres National Forest. It's the Monterey Ranger District. It's the Silver Peak Wilderness Area, which is separated by about a half mile from the Ventana Wilderness Area. Which sort of leads me into the NEPA aspect of the case and the recreation. There are several reasons why the Forest Service determined that there would be no significant impact on recreation here that required preparation of an environmental impact statement. One of them is just the amount of area affected in this case. 185 acres of wilderness in a ranger district with over 260,000 acres is not going to affect much in the way of recreation. I want to point out that the Forest Service did actually discuss and disclose what impacts cattle have on recreational users. It says it had visual impacts. Users will see them. There's auditory impacts. You may hear the animals and olfactory impacts from the smell of the animals and the waste. That's in the excursion record at 132. It's not as if the Forest Service didn't consider how recreational users will interact at all. In fact, it said that folks who use the wilderness on horseback and like to ride horses actually appreciate the grazing operations because there's water sources available that are readily available for the horses to use. The other things that minimize the impact here is that the grazing occurred only in the winter and there's no established recreation on this cozy cove and the grazing is not a new use. This land has been used for grazing for 100 years so wilderness users, unless there are questions on the sensitive species, the plant species, and the Forest Service's analysis there, I'll simply just rest on the briefs. Thank you. I'll respond very briefly in my minute and a half, Your Honor. Judge Goodwin, you asked if there is a map. There is a map in the record. It's at the second supplemental ER at page 2. It's a map of the allotment and adjacent lands. I don't know how geographically large a map you're looking for, but there is a small map there. And then, substantively, on the question of intent. What is the page reference on that? The second supplemental excerpts of record at page 2, Bate Stamp 2 on the bottom right-hand corner. Okay. Thank you. Yes. On the question of intent, what matters is what Congress intended. It doesn't matter what the Forest Service intended. But even if it did, I would direct the Court to the agency's purchase unit justification statement, the 10-page statement that the Los Padres Forest used in order to secure land and water conservation funds to buy these lands. And in that justification statement, there is no mention of livestock grazing. The whole justification for bringing these lands into public ownership was about their recreational potential. It wasn't about livestock grazing. I have nothing further. Thank you.
judges: Goodwin, Schroeder, Hawkins